**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PARK PLACE HOSPITALITY, LLC,** | ) | |
| Individually and on behalf of all others | ) | |
| similarly situated, | ) | |
| | ) | Case No. |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **DEMAND FOR JURY TRIAL** |
| **CONTINENTAL INSURANCE** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## CLASS ACTION COMPLAINT

Plaintiff, Park Place Hospitality, LLC d/b/a Hilton Garden Inn Milwaukee Northwest Conference Center ("Park Place" or "Plaintiff"), individually and on behalf of all others similarly situated, files this Class Action Complaint against Defendant Continental Insurance Company (referred herein as "CNA" or "Defendant"). In support thereof, Plaintiff alleges the following upon personal knowledge as to itself and its own acts, and as to all other matters upon information and belief, based upon the investigation made by and through its attorneys:

## NATURE OF THE CASE

1. Park Place owns and operates a hotel, restaurant, lounge and banquet and meeting facilities in Milwaukee, Wisconsin.

2. To protect the property and income derived from its operations, at all times relevant, Plaintiff was insured under a commercial property insurance policy issued by Defendant with policy number 6057091073 (the "Policy"). Alsip Hospitality of Delaware LLC d/b/a Doubletree by Hilton Chicago/Alsip, which owns and operates a hotel, restaurant, lounge and banquet and meeting facilities in Alsip, Illinois, and Fireside Land Development LLC d/b/a Hilton Chicago

1

Northbrook, which owns and operates a hotel, restaurant, lounge and banquet and meeting facilities in Northbrook, Illinois are named insureds under the Policy and are located in Illinois.

3.      The Policy was issued by CNA.  Under the Policy, CNA is responsible for receiving and managing claims and loss notices, responding to questions about insurance and coverage, and receiving process served on its designated agent, among other things.

4.      The Policy is a bilateral contract.  Plaintiff agreed to pay premiums to Defendant, in exchange for Defendant's promises of coverage for certain losses.

5.      Among other types of coverage, the Policy protects Plaintiff against costs associated with the presence of a virus, including a loss of business income due to a partial or complete suspension of its operations.

6.      Specifically, the Policy provides "Fungi, Wet Rot, Dry Rot and Microbe" coverage under which Defendant promised to pay for the loss of business income, cost of restoration and extra expense due to losses caused by a "microbe".

7.      Viruses are included in the Policy's definition of a "microbe".

8.      Plaintiff duly complied with its obligations under the Policy and paid the requisite premiums.

9.      Beginning in March 2020, Plaintiff was forced to incur restoration and extra expenses as well as suspend the business operations at its hotel, restaurant, lounge and banquet and meeting facilities due to the presence of a microbe – SARS-CoV-2 or COVID-19 (referred to herein as "COVID-19").  This microbe caused Plaintiff to suffer significant losses and incur significant expenses.

10.      Plaintiff timely filed a claim for its losses and expenses on March 26, 2020. Plaintiff's claim was denied by CNA on June 5, 2020.

2

11. Under the Policy, Defendant promised to cover Plaintiff's business losses and expenses, expressly including those caused by a microbe, and is obligated to pay for them. But in blatant breach of its contractual obligations, Defendant has failed to pay for these losses and expenses.

12. Upon information and belief, Defendant has failed to pay for similar losses and expenses of other insureds holding policies that are, in all material respects, identical.

## **JURISDICTION & VENUE**

13. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d) because there is complete diversity between Defendant and at least one member of the class; there are more than one hundred members of the Class and each subclass described in Paragraphs 109 through 111; and the amount in controversy exceeds $5,000,000 exclusive of interest and costs. This Court also has subject matter jurisdiction under 28 U.S.C. §§ 2201 and 2202 and is authorized to grant declaratory relief under these statutes. All other factual conditions precedent necessary to empower this Court with subject matter and personal jurisdiction have been satisfied.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the Defendant is subject to personal jurisdiction in this district, has a registered agent in this district, a substantial part of the property that is the subject of this action is situated in this district, and a substantial portion of Defendant's conduct that forms the basis of this action occurred in Illinois, including within the boundaries of this district.

15. This Court has personal jurisdiction over the Defendant because Plaintiff's claims arise out of, among other things, the Defendant conducting, engaging in, and/or carrying on business in Illinois; Defendant's maintenance of an office in Illinois; Defendant breaching a contract in this State by failing to perform acts required by the contract; and Defendant contracting

3

to insure property in Illinois, including but not limited to certain premises insured under the Policy. Defendant also purposefully availed itself of the opportunity of conducting activities in the State of Illinois by marketing its insurance policies and services within the State, and intentionally developing relationships with brokers, agents, and customers within the State to insure property within the State, all of which resulted in the policies at issue in this action.

## PARTIES

16.     Park Place owns and operates a hotel, restaurant, lounge and banquet and meeting facilities in Milwaukee, Wisconsin.  Park Place is organized under the laws of Delaware, with its principal place of business at 11600 West Park Place, Milwaukee, WI 53224.

17.     Continental Insurance Company is an Illinois corporation with its principal place of business in Cook County, Illinois, and regularly conducts business in this district.

18.     At all times material, Defendant engaged in substantial and not isolated activity on a continuous and systematic basis in the State of Illinois, namely by issuing and selling insurance policies from Illinois.

## FACTUAL ALLEGATIONS

*COVID-19*

19.     COVID-19 is a physical substance.

20.     COVID-19 is a human pathogen that causes the disease COVID-19, which can be lethal.

21.     COVID-19 can be present outside the human body in fluid particles.

22.     COVID-19 can and does remain capable of being transmitted and active on inert physical surfaces for a period of time.

23.     COVID-19 can and does remain capable of being transmitted and active on floors, walls, furniture, desks, tables, chairs, countertops, computer keyboards, touch screens, cardboard

4

packages, food items, silverware, plates, serving trays, glasses, straws, menus, pots, pans, kitchen utensils, faucets, refrigerators, freezers, and other items of property for a period of time. COVID-19 can be transmitted by way of human contact with surfaces and items of physical property on which COVID-19 particles are physically present. No matter how often surfaces are cleaned, the COVID-19 virus will continue to be deposited on surfaces if the premises are occupied.

24. COVID-19 has been transmitted by way of human contact with surfaces and items of physical property located at premises in Illinois and Wisconsin.

25. COVID-19 has been transmitted by human to human contact and interaction at premises in Illinois and Wisconsin, including places like hotels, restaurants, lounges and banquet and meeting facilities.

26. COVID-19 can be transmitted through airborne particles emitted into the air at premises.

27. COVID-19 has been transmitted by way of human contact with airborne COVID-19 particles emitted into the air at premises in Illinois and Wisconsin.

28. The presence of any COVID-19 particles renders items of physical property unsafe.

29. The presence of any COVID-19 particles on physical property impairs its value, usefulness and/or normal function.

30. The presence of any COVID-19 particles causes direct physical harm to property.

31. The presence of any COVID-19 particles causes direct physical loss to property.

32. The presence of any COVID-19 particles causes direct damage to property. The presence of any COVID-19 particles at premises renders the premises unsafe, thereby impairing the premises' value, usefulness and/or normal function.

33. The presence of people infected with or carrying COVID-19 particles renders

physical property in their vicinity unsafe and unusable, resulting in direct physical loss or damage to that property.

34.     The presence of people infected with or carrying COVID-19 particles at premises renders the premises, including property located at that premises, unsafe, resulting in direct physical loss or damage to the premises and property.

35.     The actual or threatened presence of COVID-19 requires continuous sanitation and disinfectant standards and processes that exceed normal or routine cleaning practices.  The practices are designed and implemented to restore the property to a safe condition and to reduce the potential presence of COVID-19.

***The Policy Language***

36.     Park Place's Policy has a policy period of June 1, 2019 to June 19, 2020.  The insured property is located at: 11600 West Park Place, Milwaukee, WI 53224.  A true and correct copy of the Policy is attached to this Complaint as Exhibit "A" and incorporated herein by reference.

37.     The Policy provides coverage for "direct physical loss of or damage to real property at a location directly caused by a Covered Peril."  *See* Exhibit A at p. 3 of 31.

38.     Plaintiff gave timely notice of its claim for coverage, but its claim was denied, without any investigation.  In denying coverage, Defendant contended that Plaintiff did not sustain "direct physical loss of or damage to property" within the meaning of the Policy.  But the presence of COVID-19 *did* cause direct physical loss of and damage to Plaintiff's property. Under any reasonable construction, the phrase "direct physical loss of or damage to" property is broad and would include detrimental physical effects which alter and impair the functioning of the tangible, material dimensions of property—especially where, as here, property is rendered nonfunctional

6

for its intended purpose due to the altered appearance, shape, and other material aspects of the property.  That is precisely the type of loss and damage caused by COVID-19.  Furthermore, there is no reasonable explanation for the enhanced cleaning and sanitation measures that Plaintiff is required to perform other than due to the presence of COVID-19.

39.     The Policy does not define the phrase "direct physical loss of or damage to".

40.     In the Policy, "loss" is used in the alternative to "damage."  Thus, there is coverage provided for both "loss" and "damage," either alternatively or collectively, because "loss" coverage is different from, and in addition to, "damage" coverage.  Property "loss" refers to, among other things, being deprived of a property's function, while "damage" refers to, among other things, the impairment of property or a reduction in its functionality. The adjective "physical," among other things, distinguishes between the tangible, material aspects of an object and those that are purely intangible, such as sentiment, emotion, or imagination.  In addition, under a plain grammatical reading of the phrase "direct physical loss of or damage to" property (or "direct physical loss or damage to" property), the words "direct" and "physical" can be reasonably construed as modifying only "loss" coverage—not "damage" coverage. To the extent that any language in the Policy is ambiguous, it should be construed against Defendant and in favor of coverage.

41.     Physical loss of, or damage to, property may be reasonably interpreted to occur when a covered cause of loss threatens or renders property unusable or unsuitable for its intended purpose or unsafe for normal human occupancy and/or continued use.

42. Defendant specifically agreed to pay for all losses caused by a "Covered Peril" which the policy defines as "a fortuitous cause or event, not otherwise excluded, which occurs during this policy period."

43. The Policy provides Plaintiff with, among other things, various business income and extra expense coverages during the Policy Term.

44. One type of coverage provided by the Policy is "Fungi, Wet Rot, Dry Rot and Microbe" coverage. This Additional Coverage provides:

1. The Insurer will pay the following provided fungi, wet rot, dry rot or microbes are the direct result of a covered peril, other than fire or lightning:

   a. direct physical loss of or damage to covered property caused by fungi, wet rot, dry rot or microbes, including the cost of removing the fungi, wet rot, dry rot or microbes;

   b. the reasonable cost to tear out and replace any part of the covered building or other property as needed to gain access to the fungi, wet rot, dry rot or microbes; and

   c. the cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is reason to believe that fungi, wet rot, dry rot or microbes are still present.

2. To the extent time element coverage is applicable at that location or reported unspecified location, the Insurer will also pay, as provided, for:

a.    the actual loss of business income the Named Insured sustains during the period of restoration due to the necessary suspension or delay in operations;

b.    the actual loss of research and development business income the Named Insured sustains during the period of restoration due to the necessary suspension or delay of research and development projects; and

c.    extra expense, due to the:

    i.    direct physical loss of or damage to covered property caused by fungi, wet rot, dry rot or microbes that are the result of a covered peril, other than fire or lightning; or

    ii.    prolonged period of restoration due to the remediation of fungi, wet rot, dry rot or microbes from a covered loss.

Exhibit A at pp. 13-14 of 31.

45.    The limit for this Additional Coverage is $50,000.

46.    Each of the operative terms of this coverage provision is defined as follows.

47.    "Business Income" means "net income, including rental value, plus continuing operating expenses. Business income does not include research and development business income." *See* Policy Declarations and Schedules attached hereto as Exhibit "B" at p. 1 of 21.

48.    Microbe means "any: A. non-fungal microorganism; B. non-fungal, colony-form organism; C. virus; or D. bacteria. Microbe includes any spores, mycotoxins, odors, or any other substances, products, or byproducts produced by, released by, or arising out of the current or past presence of microbes." Exhibit B at p. 9 of 21.

49.     "Operations" means "the Named Insured's business activities occurring at the covered premises prior to the time and date of the loss or damage, including the Named Insured's activities as a lessor.  Operations does not include business activities as part of research and development projects."  Exhibit B. at p. 12 of 21.

50.     "Period of Restoration" means, in pertinent part:

    A.  the period of time that begins with:

        1.  the time and date that the physical loss or damage that causes suspension of operations occurs; or

        2.  the date operations would have begun if such loss or damage delays the start of operations and such loss or damage is to any of the following:

            a.  buildings whether complete or under construction;

            b.  alterations or additions to existing buildings;

            c.  machinery, equipment, supplies or materials that are:

        (1)     used in such construction, alterations or additions;

        (2)     incidental to the occupancy of the area intended for construction, alteration or addition; or incidental to the alteration of the occupancy of an existing building.

Exhibit B at pp. 12-13 of 21.

51.     "Suspension" means "A. the slowdown or cessation of the Named Insured's business activities; or B. that a part or all of the covered premises is rendered untenantable." Exhibit B at p. 19 of 21.

52.     The Policy contains the following Exclusion:  "The Insurer will not pay for loss or damage caused directly or indirectly by or resulting from the presence, growth, proliferation, spread or any activity of fungi, wet or dry rot, or microbes. . ." (the "Virus Exclusion").   However, this Virus Exclusion does not preclude Plaintiff's Microbe Coverage claims under the Policy.  Specifically, the Microbe Coverage section of Plaintiff's Policy provides:  "The Fungi, Wet Rot, Dry Rot and Microbes Excluded Peril under the EXCLUSIONS section does not apply, but only to the extent of the coverage provided under this ADDITIONAL COVERAGE."  Exhibit

A at p. 14 of 31.

*Illinois's Response to COVID-19*

53.     In response to COVID-19 and the COVID-19 Pandemic, the Governor of Illinois issued multiple executive orders pursuant to the authority vested in him by the Illinois Constitution and the laws of Illinois.

54.     Similarly, the Illinois Department of Health, pursuant to its authority under Illinois law, has issued multiple orders, including a Stay At Home Order.

55.     The State of Illinois is a civil authority as contemplated by the Policy.

56.     The Illinois Department of Health is a civil authority as contemplated by the Policy.

57.     The Governor of the State of Illinois is a civil authority as contemplated by the Policy.

58.     On March 11, 2020, the World Health Organization characterized the COVID-19 outbreak as a pandemic.

59.     On March 15, 2020, Illinois Governor J.B. Pritzker issued Executive Order 2020-07 stating "it is necessary and appropriate for the State of Illinois to immediately take measures to protect the public's health in response to this COVID- 19 outbreak."  This order was in response to the physical presence of COVID-19 and the COVID-19 Pandemic.

60.     The stated goal of this order was to slow the spread of COVID-19 by minimizing in-person interaction in an environment with "frequently used services in public settings, including bars and restaurants…" The March 15th order further provided that "the ongoing spread of COVID-19 and the danger the virus poses to the public's health and wellness require the reduction of on-premises consumption of food and beverages."

61.     On March 20, 2020, Governor Pritzker issued a Closure Order (Executive Order

2020-10) (a.k.a., a Stay At Home Order) requiring all Illinois residents to stay at home barring exceptions such as essential travel for essential work or supplies, exercise and recreation, through April 7, 2020. Moreover, the March 20th order reduced the allowable public and private gathering size to no more than 10 people. The March 20th order was again in direct response to the continued and increasing presence of the coronavirus on property or around Plaintiffs' premises.

62.     On April 23, 2020, Governor Pritzker announced the statewide Stay At Home order previously set to expire April 30, 2020, was extended through May 29, 2020. Governor Pritzker's May 29 executive order permitted outdoor food and beverage service to resume, but only in accordance with Illinois Department of Commerce and Economic Opportunity (DCEO) guidance, which set forth a vast array of physical restrictions and requirements on restaurants, bars and banquet and meeting facilities. Under DCEO's "physical workspace" guidelines, establishments were required, among other things, to: (a) "configure space to allow for at least 6-ft. of distance between tables or other designated customer service areas"; (b) "[e]nsure that the area for take-out customers allows for at least 6-ft of separation from seated customers"; (c) "close all open congregate areas (e.g., waiting areas)," "all self-service food areas (e.g., buffets, salad bars, coffee station)," and "all self-service beverage stations"; (d) "eliminate table presets (e.g., table tents, menus, salt and pepper shakers, lemons, straws, shared condiments, etc.)"; and (e) "display signage at entry with face covering requirements, social distancing guidelines, and cleaning protocols[.]"

63.     On June 26, 2020, Governor Pritzker issued an executive order permitting restaurants to resume on-premises indoor food and beverage service, provided that establishments offering such service follow DCEO guidance. Under DCEO's "[m]inimum guidelines," the maximum capacity for seated areas must be determined by "arranging seating" to provide at least six feet between all tables, while standing areas must be capped at a maximum occupancy of 25%.

12

Restaurants providing indoor service were also impaired by extensive restrictions on their "physical workspaces" similar to those DCEO issued for the earlier, outdoor-only phase. For example, establishments were required to (a) "[e]nsure that the area for take-out patrons allows for at least 6-ft of separation from seated patrons"; (b) "use 6-feet markings on floor [in bar areas] to provide guidance on social distancing between unrelated parties"; (c) "configure any seating [in waiting areas] to be 6-ft apart to allow for social distancing"; (d) "[e]liminate any table presets (e.g., table tents, menus, ketchup bottles, salt and pepper shakers, lemons, straws, shared condiments, etc.)"; and (e) "display signage at entry and throughout workspace with face covering requirements, social distancing guidelines, cleaning protocols, and any reduced capacity limit[.]"

*Wisconsin's Response to COVID-19*

64.     In response to COVID-19 and the COVID-19 Pandemic, the Governor of Wisconsin issued multiple executive orders pursuant to the authority vested in him by the Wisconsin Constitution and the laws of Wisconsin.

65.     Similarly, the Wisconsin Department of Health, pursuant to its authority under Wisconsin law, has issued multiple orders, including a Stay At Home Order.

66.     The State of Wisconsin is a civil authority as contemplated by the Policy.

67.     The Wisconsin Department of Health is a civil authority as contemplated by the Policy.

68.     The Governor of the State of Wisconsin is a civil authority as contemplated by the Policy.

69.     Similar Orders were issued by municipalities in Milwaukee County, Wisconsin. The municipalities are civil authorities as contemplated by the Policy.

70.      On March 11, 2020, the World Health Organization characterized the COVID-19

outbreak as a pandemic.

71.     On March 12, 2020, Wisconsin Governor Tony Evers issued Executive Order 72, "Declaring a Health Emergency in Response to the COVID-19 Coronavirus."  In the accompanying press release, Governor Evers reminded people of simple steps to avoid getting sick, including frequent hand washing, covering coughs and sneezes, and staying home when sick.

72.     On March 16, 2020, Governor Evers issued Emergency Order 4, effective at 12:01 am on March 17, 2020, ordering "a statewide moratorium on mass gatherings of 50 people or more to mitigate the spread of COVID-19."  Restaurants and bars were limited to "50 percent of seating capacity or 50 total people, whichever is less," and were required to maintain "distancing of 6 feet between tables, booths, bar stools, and ordering counters."

73.     On March 17, 2020, Governor Evers issued Emergency Order 5, effective at 5:00 pm on March 17, 2020, prohibiting gatherings of "10 or more people in a single room or single confined space at the same time." Restaurants were allowed to "remain open for take-out or delivery service only," and were required to "preserve social distancing of six feet between customers during pick up."

74.     On March 20, 2020, Governor Evers issued Emergency Order 8, "Updated Mass Gathering Ban," further detailing the limit on bars and restaurants to take-out and delivery (with no delivery of alcoholic beverages to retail customers unless they paid in person).

75.     On March 24, 2020, Governor Evers issued Emergency Order 12, a "Safer At Home Order." Governor Evers stated: "Despite prior emergency orders banning mass gatherings, the rates of infection continue to drastically increase, necessitating additional measures to slow the rate of infection and save lives."  All individuals present within the state were ordered "to stay at home or their place of residence," with certain exceptions.  Bars and restaurants remained limited

14

to take-out and delivery (with no delivery of alcoholic beverages to retail customers).

76.     Executive Order 12 provides that a violation of the Order is punishable by up to 30 days in jail and/or a fine not to exceed $250.00.

77.     On April 16, 2020, Governor Evers entered Executive Order 28, "Safer at Home Order" which only allowed restaurants to offer take-out and delivery services and prohibited all "non-essential" travel.

78.     On July 30, 2020, Governor Evers issued Executive Order 82 declaring a State of Emergency in effect for sixty (60) days due to the increased presence and spread of COVID-19.

79.     These civil authority orders limited or prohibited access and operations at Park Place's premises described in the Policy.

***Wisconsin's Exercise of Civil Authority Suspends or Partially Suspends Operations at Plaintiff Park Place's Hotels and Restaurants***

80.     While Plaintiff Park Place's hotel does qualify as an Essential Business, Park Place was required to significantly reduce operations at its restaurant, lounge and banquet and meeting facilities as a result of the civil authority orders.

81.     The civil authority orders limited or prohibited access to Plaintiff Park Place's premises described in the Policy.

82.     The State of Wisconsin, through the Governor, have issued, and continue to issue, authoritative orders governing Wisconsinites and Wisconsin businesses, including Park Place's, in response to COVID-19 and the COVID-19 Pandemic, the effect of which have required and continue to require Plaintiff to cease and/or significantly reduce operations at, and that have prohibited and continue to prohibit access to, the premises described in the Policies.

*Plaintiff's Covered Losses*

83.     The presence of COVID-19 and the public health emergency it created has prompted actions by civil authorities throughout the United States, including but not limited to civil authorities with jurisdiction over Plaintiff and other named insureds under the Policy: the State of Wisconsin and the State of Illinois.

84.     As of the date of filing this Complaint, Milwaukee County, where Plaintiff Park Place's principal place of business is located, has over 33,000 cases of COVID-19, with almost 450 deaths.

85.     The COVID-19 Pandemic is physically impacting public and private property in Illinois, Wisconsin and throughout the country.

86.     The COVID-19 Pandemic has caused and continues to cause direct physical loss or damage to property.

87.     People in Illinois and Wisconsin have been diagnosed with COVID-19.

88.     People in Illinois and Wisconsin have, and had, COVID-19 but have not been diagnosed.

89.     People in Illinois and Wisconsin have COVID-19 particles on or about their person and personal property.

90.     Properties and premises throughout Illinois and Wisconsin contain the presence of COVID-19 particles on surfaces and items of property.

91.     Given the breadth and scope of the COVID-19 Pandemic, it cannot be disputed that COVID-19 particles have been physically present at Plaintiff's premises during the time the Policy was in effect.

92.     Given the breadth and scope of the COVID-19 Pandemic, it cannot be disputed that

COVID-19 particles have been physically present on surfaces and items of property located at Plaintiff's premises during the time the Policy was in effect.

93.     Given the breadth and scope of the COVID-19 Pandemic, it cannot be disputed that people carrying COVID-19 particles in, on or about their person have been present at Plaintiff's premises during the time the Policy was in effect.

94.     Given the breadth and scope of the COVID-19 Pandemic, it cannot be disputed that airborne COVID-19 particles have been physically present at Plaintiff's premises during the time the Policy was in effect.

95.     Plaintiff sustained direct physical loss of or damage to items of property located at its premises and direct physical loss of and damage to its premises described in the Policy as a result of the presence of COVID-19 particles and/or the COVID-19 Pandemic.

96.     Plaintiff has been required to perform additional cleaning, restoration and remediation measures to combat the presence and spread of COVID-19.

97.     There has been a direct physical loss of or damage to the covered premises under the Policy by, among other things, damaging the property, denying access to the property, preventing customers and employees from physically occupying the property, causing the property to be physically uninhabitable by customers and employees, causing its function to be nearly eliminated or destroyed, and/or causing a suspension of business operations on the premises.

98.     Prior to the municipal and state "stay-at-home" orders, Plaintiff served hundreds of guests and customers each day in its hotel, restaurant, lounge and banquet and meeting facilities.

99.     For months, Plaintiff has only been able to operate on a limited basis.

100. Plaintiff has suffered a suspension of normal business operations in terms of a significant slowdown or shutdown of business activities and a cessation of operations on the premises, sustained losses of business income, restoration costs and incurred extra expenses.

101. These losses and expenses have continued through the date of filing of this action. As of the date of filing, the restaurant and lounge premises at Plaintiff's hotel is opened for on-site consumption at a very limited capacity or for take-out only. Moreover, Plaintiff has been unable to hold meetings, events or other large gatherings in its banquet and meeting facilities. Because Plaintiff has complied with its contractual obligations, it is entitled to payment for these losses and expenses.

102. Park Place's Covered Property suffered "direct physical loss or damage" due to the COVID-19 Pandemic and the ubiquitous nature of the COVID-19 virus.

***Presentment of Plaintiff's Insurance Claim and CNA's Response***

103. On or about March 15, 2020, Plaintiff provided notice of its claim to Defendant, consistent with the terms and procedures of the Policy. In response, Defendant sent Plaintiff a denial letter. *See* Letter from Mark Chancellor, Continental Insurance Company, to Newtel Management, LLC (June 5, 2020), attached hereto as "Exhibit C". Thus, contrary to the plain language of the Policy and Defendant's corresponding promises and contractual obligations, Defendant has refused to pay for Plaintiff's losses and expenses under the terms of the Policy.

104. CNA chose not to provide coverage for the losses suffered by Plaintiff under claims tendered for losses due to COVID-19, including claims under the Microbe Coverage section of the Policy.

105. This appears to be consistent with the position Defendant has taken nationwide, even though on its website, Defendant publicly represents:

> *For more than 100 years, CNA has earned a reputation as one of the most trusted commercial insurance companies in the business.* It's a powerful legacy built on expertise, solid products and great services. Since 1897, we've remained strong, helping more than 1 million businesses and professionals in the U.S. and internationally avoid and manage the risks they encounter in their daily business operations, and *bounce back from catastrophes that would have otherwise forced them to close for good.*

Business Insurance Solutions, CNA, *available at* https://www.cna.com/web/guest/cna/ps/

(emphasis added).

## CLASS ACTION ALLEGATIONS

106.    The class claims all derive directly from a single course of conduct by Defendant: its systematic and uniform refusal to pay insureds for covered losses and the actions taken by civil authorities to suspend business operations.

107.    Plaintiff brings this action pursuant to Rules 23(a), 23(b)(1), 23(b)(2), and/or 23(b)(3), as well as 23(c)(4), of the Federal Rules of Civil Procedure, individually and on behalf of all others similarly situated. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

108.    Plaintiff seeks to represent a nationwide class defined as:

> All persons and entities in the United States with Fungi, Wet Rot, Dry Rot and Microbe coverage under a property insurance policy issued by Defendant that suffered an actual loss of Business Income and/or Extra Expense caused by the presence or damage of COVID-19, and for which Defendant has either actually denied or stated it will deny a claim for the losses or has otherwise failed to acknowledge, accept as a covered loss, or pay for the covered losses ("the Microbe Coverage Class").

109.    Plaintiff Park Place also seeks to represent a subclass of the Microbe Coverage Class consisting of those CNA insureds located in Illinois which subclass is defined as:

> (a)    All persons and entities in the Illinois with Fungi, Wet Rot, Dry Rot and Microbe coverage under a property insurance policy issued by Defendant that suffered an actual loss of Business Income and/or Extra Expense caused by the presence or damage of COVID-19, and for which Defendant has either actually

denied or stated it will deny a claim for the losses or has otherwise failed to acknowledge, accept as a covered loss, or pay for the covered losses ("the Illinois Microbe Coverage Subclass");

and a subclass of the Microbe Coverage Class consisting of those CNA insureds located in Wisconsin which subclass is defined as:

(b)     All persons and entities in the Wisconsin with Fungi, Wet Rot, Dry Rot and Microbe coverage under a property insurance policy issued by Defendant that suffered an actual loss of Business Income and/or Extra Expense caused by the presence or damage of COVID-19, and for which Defendant has either actually denied or stated it will deny a claim for the losses or has otherwise failed to acknowledge, accept as a covered loss, or pay for the covered losses ("the Wisconsin Microbe Coverage Subclass").

110.    Excluded from each defined proposed Class and subclasses are Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; Class Counsel and their employees; and the judicial officers and Court staff assigned to this case and their immediate family members.

111.    Plaintiff reserves the right to modify, expand, or amend the definitions of the proposed Class and subclasses, as appropriate, during the course of this litigation.

112.     This action has been brought and may properly be maintained on behalf of each Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

**Numerosity and Ascertainability**

113.    This action satisfies the requirements of FED. R. CIV. P. 23(a)(1).  The members of each proposed Class and subclass are so numerous that individual joinder of all Class members is impracticable. There are, at a minimum, hundreds of members of the proposed Class, and these individuals and entities are spread out across the United States.

114.    The identity of Class and subclass members is readily ascertainable, as the names and addresses of all Class members can be identified in Defendant's or its agents' books and records. Class and subclass members may be notified of the pendency of this action by recognized,

Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

## **Predominance of Common Issues**

115.    This action satisfies the requirements of FED. R. CIV. P. 23(a)(2) and 23(b)(3) because this action involves common questions of law or fact that predominate over any questions affecting only individual Class and subclass members. Defendant issued all-risk policies to all of the members of each proposed Class in exchange for payment of premiums by the Class members. The questions of law and fact affecting all Class members include, without limitation, the following:

   a.   Whether Plaintiff and the Class and subclass members suffered a covered loss under the policies issued to members of the Class;

   b.   Whether Defendant wrongfully denied all claims based on the facts set forth herein;

   c.   Whether Defendant's Additional Coverage for fungi, wet rot, dry rot and microbe applies based on the facts set forth herein;

   d.   Whether Defendant breached its contracts of insurance through a uniform and blanket denial of all claims for business losses based on the facts set forth herein;

   e.   Whether Plaintiff and the Class and subclass members suffered damages as a result of Defendant's actions; and

   f.   Whether Plaintiff and the Class and subclass members are entitled to an award of reasonable attorneys' fees, interest, and costs.

## **Typicality**

116.    This action satisfies the requirements of FED. R. CIV. P. 23(a)(3) because Plaintiff's claims are typical of the claims of the Class and subclass members and arise from the same course of conduct by Defendant.  Plaintiff and the other Class and subclass members are all similarly

affected by Defendant's refusal to pay under their property insurance policies. Plaintiff's claims are based upon the same legal theories as those of the other Class and subclass members. Plaintiff and the other Class and subclass members sustained damages as a direct and proximate result of the same wrongful practices in which Defendant engaged. The relief Plaintiff seeks is typical of the relief sought for the absent Class and subclass members.

### Adequacy of Representation

117.    This action satisfies the requirements of FED. R. CIV. P. 23(a)(4) because Plaintiff will fairly and adequately represent and protect the interests of Class and subclass members. Plaintiff has retained counsel with substantial experience in prosecuting complex class action litigation.

118.    Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of the Class and subclass members and have the financial resources to do so. Neither Plaintiff nor its counsel have interests adverse to those of the Class and subclass members.

### Inconsistent or Varying Adjudications and the
### Risk of Impediments to Other Class Members' Interests

119.    This action satisfies the requirements of FED. R. CIV. P. 23(b)(1). Plaintiff seeks class-wide adjudication as to the interpretation and scope of Defendant's property insurance policies that use the same language and terms as the Policy. The prosecution of separate actions by individual members of the proposed Classes would create an imminent risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant.

### Final Injunctive and/or Corresponding Declaratory Relief
### with Respect to the Classes Is Appropriate

120.    This action satisfies the requirements of FED. R. CIV. P. 23(b)(2) because Defendant acted or refused to act on grounds generally applicable to Plaintiff and the members of the proposed

Classes, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to the Class and subclass members. The class claims all derive directly from Defendant's systematic and uniform refusal to pay insureds for losses suffered due to actions taken by civil authorities to suspend or interrupt business operations in response to the COVID-19 Pandemic. Defendant's actions, or refusal to act, are grounded upon the same generally applicable legal theories.

**Superiority**

121. This action satisfies the requirements of FED. R. CIV. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient group-wide adjudication of this controversy. The common questions of law and fact regarding Defendant's conduct and the interpretation of the common language in its property insurance policies predominate over any questions affecting only individual Class and subclass members.

122. Because the damages suffered by certain individual Class and subclass members may be relatively small, the expense and burden of individual litigation would make it very difficult for all individual Class and subclass members to redress the wrongs done to each of them individually, such that many Class and subclass members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under FED. R. CIV. P. 23(b)(3)(A).

123. The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class or subclass member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of

individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the Court, and the public of class treatment in this Court, making class adjudication superior to other alternatives, under FED. R. CIV. P. 23(b)(3)(D).

124.    Plaintiff is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.   The Court may, on motion of Plaintiff or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

**COUNT I – BREACH OF CONTRACT**
**(On behalf of the Microbe Coverage Class)**

125.    Plaintiff incorporates by reference and realleges each and every allegation above as if fully set forth herein.

126.    Plaintiff brings this Count both individually and on behalf of the other members of the Microbe Coverage Class.

127.    Plaintiff's Policy, as well as the policies of the other Microbe Coverage Class members, are insurance contracts under which Defendant was paid premiums in exchange for promises to pay Plaintiff and Class members' losses and expenses covered by the policies.

128.    In the Policy and other Class members' policies, Defendant promised to pay for losses of business income sustained and extra expenses and restoration costs incurred when

physical loss or damage occurs to the insured premises as a result of a microbe, including a virus such as COVID-19.

129.    Plaintiff and Class and subclass members suffered losses and incurred expenses as a result of a microbe at their insured premises under the Policy and Class and subclass members' policies.

130.    These losses satisfied all requirements to trigger Microbe coverage under the Policy and other Class and subclass members' policies.

131.    Plaintiff and the other Class and subclass members have complied with all applicable provisions of their respective policies, including payment of premiums.

132.    Defendant, without justification and in bad faith, has denied coverage and refused performance under the Policy and other Class and subclass members' policies by denying coverage for these losses and expenses.  Accordingly, Defendant is in breach of the Policy and other Class and subclass members' policies.

133.    As a result of Defendant's breaches of the Policy and other Class members' policies, Plaintiff and the Class and subclass members have suffered actual and substantial damages for which Defendant is liable.

WHEREFORE, Plaintiff, both individually and on behalf of the Class and subclass members, seeks compensatory damages resulting from Defendant's breaches of the Policy and other Class and subclass members' policies and seek all other relief deemed appropriate by this Court.

## COUNT II – DECLARATORY JUDGMENT
### (On behalf of the Microbe Coverage Class and Subclasses)

134.    Plaintiff incorporates by reference and realleges each and every allegation above as if fully set forth herein.

25

135.    Plaintiff brings this Count both individually and on behalf of the other members of the Microbe Coverage Class and subclasses.

136.    Under 28 U.S.C. §§ 2201 & 2202, this Court has jurisdiction to declare the rights and other legal relations of the parties in dispute.

137.    Plaintiff's Policy, as well as the policies of other Microbe Coverage Class members, are insurance contracts under which Defendant was paid premiums in exchange for promises to pay Plaintiff's and Class members' losses for claims covered by their policies.

138.    In the Policy and other Class and subclass members' policies, Defendant promised to pay for losses of business income sustained, extra expenses and restoration costs incurred when, among other things, a microbe causes damage to the insured premises.

139.    Plaintiff and Class and subclass members suffered losses and incurred expenses to their insured premises as a result of a microbe.

140.    These losses satisfied all requirements to trigger microbe coverage under the Policy and other Class and subclass members' policies.

141.    Plaintiff and the other Class and subclass members complied with all applicable provisions of their respective policies, including payment of premiums.

142.    Defendant, without justification, disputes that the Policy and other Class and subclass members' policies provide coverage for these losses.

143.    Plaintiff, both individually and on behalf of the other members of the Microbe Coverage Class, seeks a Declaratory Judgment that its Policy and the other Microbe Coverage Class members' policies provide coverage for the losses that Class and subclass members have sustained and extra expenses they have incurred caused by a microbe.

144.     An actual case or controversy exists regarding Plaintiff's and other Class and subclass members' rights and Defendant's obligations under the Policy and Class and subclass members' policies to reimburse Plaintiff and other Class and subclass members for these losses and extra expenses.  Accordingly, the Declaratory Judgment sought is justiciable.

WHEREFORE, Plaintiff, both individually and on behalf of other Class and subclass members, requests that this Court enter a Declaratory Judgment declaring that the Policy and other Class and subclass members' policies provide coverage for the losses and extra expenses incurred by Plaintiffs and Class and subclass members.

## COUNT III: STATUTORY PENALTY FOR BAD FAITH DENIAL OF INSURANCE UNDER 215 ILCS 5/155 (On behalf of Illinois Subclass Only)

145.     Plaintiff incorporates by reference and realleges each and every allegation above as if fully set forth herein.

146.     Upon receipt of its claim, CNA immediately denied Plaintiff's and putative Illinois subclass members' claims (either verbally or through cursory correspondence) without conducting any investigation, let alone a "reasonable investigation based on all available information" as required under Illinois law.  *See* 215 ILCS 5/154.6.

147.     CNA's denial of Plaintiff's claim was vexatious and unreasonable.

148.     CNA's denial constitutes "improper claims practices" under Illinois law—namely CNA's (1) refusals to pay Plaintiff's claim without conducting reasonable investigations based on all available information and (2) failure to provide reasonable and accurate explanations of the bases in its denials.  *See* 215 ILCS 5/154.6 (h), (n).

149.     Furthermore, CNA misrepresented that Plaintiff did not possess coverage for any of its claims and failed to disclose that Plaintiff's Policy provided $50,000 of additional coverage

for fungi, wet rot, dry rot and microbes.

150.     CNA failed to offer sufficient bases for its denials and failed to raise any bona fide disputes as to whether Plaintiff's claims were covered by its Policy.

151.     Therefore, pursuant to 215 ILCS 5/155, Plaintiff requests that, in addition to entering a judgment in favor of Plaintiff and members of the subclass and against CNA for the amount owed under the Policy at the time of judgment, the Court enter a judgment in favor of Plaintiff and members of the subclass and against CNA for an amount equal to the greater of (1) 60% of the amount which the trier of fact finds that Plaintiff and members of the subclass are entitled to recover under the Policy, exclusive of costs; and (2) $60,000 to Plaintiff and each member of the subclass.  *See* 215 ILCS 5/155.

152.     Plaintiff further requests that the Court enter a judgment in favor of Plaintiff and members of the subclass and against CNA in an amount equal to the attorneys' fees and costs incurred by Plaintiff and members of the subclass for the prosecution of this coverage action against CNA, which amount will be proved at or after trial, pursuant to 215 ILCS 5/155.

## COUNT IV: BAD FAITH
### (On behalf of Wisconsin and Illinois Subclasses Only)

153.  Plaintiff incorporates by reference and realleges each and every allegation above as if fully set forth herein.

154. Upon receipt of Plaintiff's Claims, CNA immediately denied Plaintiff's and putative Wisconsin subclass members' claims (either verbally or through cursory correspondence) without conducting any investigation, let alone a "reasonable investigation" as required under Wisconsin law.

155. There was no reasonable basis for CNA's denial of Plaintiff Park Place's and members of the subclass's claims and CNA had knowledge of or recklessly disregarded the lack

of a reasonable basis to deny Plaintiff's and members of the subclass's claims.

156. CNA's denial constitutes "improper claim settlement practices" under Wisconsin law—namely CNA's (1) refusal to pay Plaintiff and members of the subclass's claims without conducting a reasonable investigation based on all available information; (2) failure to timely pay Plaintiff and members of the subclass's claim; (3) failure to provide a reasonable explanation for denial of benefits and (4) making coverage misrepresentations to Plaintiff and members of the subclass.

157. Therefore, Plaintiff requests that, in addition to entering a judgment in favor of Plaintiff and members of the subclass and against CNA for the amount owed under the Policy at the time of judgment, the Court enter a judgment in favor of Plaintiff and members of the subclass for punitive damages, attorneys' fees and costs incurred by Plaintiff and members of the subclass for the prosecution of this coverage action against CNA, which amount will be proved at or after trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendant, as follows:

a. Entering an order certifying the proposed Classes, designating Plaintiff as Class representative, and appointing Plaintiff's attorneys as Counsel for the Class and subclasses;

b. Entering a judgment on Count I (Breach of Contract) in favor of Plaintiff and the members of the Microbe Coverage Class and awarding damages for breach of contract in an amount to be determined at trial;

c. Entering a declaratory judgment on Count II (Declaratory Judgment) in favor of Plaintiff and the members of the Microbe Coverage Class as follows:

i.    That all microbe losses and expenses incurred and sustained based on the facts and circumstances set forth above are insured and covered losses and expenses under Plaintiffs' Policy and Class members' policies; and

ii.   Defendant Continental Insurance Company is obligated to pay for the full amount of the microbe losses and expenses sustained and incurred, and to be sustained and incurred, based on the facts and circumstances set forth above.

d.  Entering judgment on Counts III & IV (Bad Faith) in favor of Plaintiff and the members of the putative subclasses and awarding statutory damages and penalties, attorneys' fees and costs in an amount to be determined at trial;

e.  An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

f.  An award of costs and attorneys' fees; and

g.  Such other or further relief as may be appropriate.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs hereby request a trial by jury of all issues so triable.

Dated:  October 28, 2020

By:  ___*/s/ Marvin A. Miller*___
Marvin A. Miller
Andrew Szot
**MILLER LAW LLC**
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: (312) 332-3400
mmiller@millerlawllc.com
aszot@millerlawllc.com

Robert G. Methvin, Jr. (ASB-6206-V68R)
James M. Terrell (ASB-0887-L73J)
Courtney C. Gipson (ASB-5152-Q91K)

**METHVIN, TERRELL, YANCEY,
STEPHENS & MILLER, P.C.**
2201 Arlington Avenue South
Birmingham, Alabama 35205
Telephone: (205) 939-0199
Facsimile: (205) 939-0399
rgm@mtattorneys.com
jterrell@mtattorneys.com
cgipson@mtattorneys.com

*Attorneys for Plaintiffs*

**DEFENDANT TO BE SERVED VIA CERTIFIED MAIL**

**Continental Insurance Company
151 North Franklin
Chicago, IL 60606**